# IN THE COURT OF APPEALS OF IOWA

No. 23-0207
Filed May 22, 2024

**AMBRASHIA MARIE CHRZAN,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Washington County, Joel D. Yates,

Judge.


        An applicant appeals the denial of her application for postconviction relief.

**AFFIRMED.**


        Thomas M. McIntee, Williamsburg, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee State.


        Considered by Tabor, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

At the postconviction-relief hearing following her conviction for child endangerment resulting in death, Ambrashia Chrzan's trial counsel testified: "Theoretically you can always do something else," but "we put on the . . . best defense we could." The district court agreed and rejected Chrzan's claims that counsel performed deficiently. Chrzan appeals, claiming trial counsel was ineffective for failing to (1) move for a court-appointed expert medical witness; (2) "object to or prevent introduction of prior bad acts evidence" that she used "street drugs" while pregnant with the child; (3) investigate and present family members as witnesses to Chrzan's parenting abilities; and (4) move for a change of venue. We affirm upon our de novo review of the record.[1]

## I.     Background Facts and Proceedings

A.M. was born prematurely to Chrzan in late May 2015. The infant tested positive for amphetamines at birth and weighed just four pounds when she was discharged from the hospital into foster care. Because of A.M.'s low birth weight, the foster mother took A.M. to frequent appointments with her primary care physician, Dr. David Nacos. Chrzan attended only two of those appointments.

Patient visit notes from A.M.'s appointments with Dr. Nacos were admitted as exhibits two through fourteen at Chrzan's criminal trial without objection from the defense. All but one of those exhibits noted a "[p]renatal maternal history of street drug use during pregnancy." The State used the patient visit notes to show

---

[1] *See Sothman v. State*, 967 N.W.2d 521, 522 (Iowa 2021) (reviewing the denial of an application for postconviction relief alleging ineffective assistance of counsel de novo).

the dates of A.M.'s appointments, the reasons for treatment, and A.M.'s weight at each appointment.

The Iowa Department of Health and Human Services returned A.M. to Chrzan's care on December 4 but continued to provide services to the family. Dr. Nacos testified that A.M.'s weight gain while in foster care was satisfactory. Indeed, she weighed fourteen pounds and two and one-half ounces the day before removal ended—a gain of just over ten pounds while in foster care. A.M.'s weight gain continued through her seven-month appointment in January 2016, when she weighed fifteen pounds. But her parents didn't bring her to her nine-month appointment in March. The appointment was rescheduled for May, but no one came to that appointment either.

Chrzan and A.M.'s father did take her to an appointment in July, but her weight had dropped to fourteen pounds and five ounces even though the parents reported that she was eating well. Dr. Nacos was concerned for A.M.'s failure to thrive and recommended an appointment with a pediatric diagnostics specialist at the University of Iowa Hospitals and Clinics (UIHC). He explained to Chrzan how important it was that A.M. attend this appointment.

Dr. Nacos expected that A.M. would see the specialist before her next appointment with him. But at that appointment in September[2]—which was the last time Dr. Nacos saw A.M.—Chrzan told Dr. Nacos that she never got a call about the specialist appointment. His office, however, had documented their contact

---

[2] This appointment was originally scheduled for September 6. But after Chrzan did not show up for the appointment with A.M., it was rescheduled to September 23.

attempts. By then, even though A.M. had gained some weight, she was still only fifteen pounds. Dr. Nacos again stressed to Chrzan that A.M. needed to be seen at the UIHC, and he put in a second referral. The department conditioned dismissal of the child-in-need-of-assistance case on the child being seen by a specialist at the UIHC. Dr. Nacos's office spoke to A.M.'s father at the end of September and rescheduled the appointment for October 11. A week before the appointment was set to take place, the family's juvenile court case was dismissed. Conditions in A.M.'s home quickly went downhill, according to Chrzan's mother, and A.M. missed her specialist appointment.

On November 9, Chrzan found A.M. deceased in her crib. Forensic pathologist Dr. Dennis Firchau conducted the autopsy of A.M. the next day. She weighed only eleven pounds and was in "a state of malnourishment or undernourishment." Dr. Firchau reached an overall conclusion of "undetermined cause of death with malnutrition and associated neglect." He ruled the manner of death was homicide, which means "death at the hands of another." Dr. Firchau explained "that the neglectful actions, whether active or inactive, . . . resulted or helped contribute to the malnourishment which significantly helped cause death in this case." Those neglectful actions included the failure to nourish the child and the neglect of her medical care, according to Dr. Firchau. His autopsy report was admitted into evidence at Chrzan's criminal trial. While the report noted that A.M. had a "meconium drug screen positive for amphetamines," the jury was never directed to that information in the report.

Chrzan was arrested and charged with child endangerment resulting in death close to one year after A.M.'s death. At Chrzan's jury trial, she called

5

department caseworker Ellyn Hildebrand as a witness. When asked by defense counsel why the department became involved with A.M. at birth, Hildebrand testified the department was already involved with A.M.'s siblings and A.M. tested positive for amphetamines at birth. She explained that after A.M. was returned to her parents' custody, the department continued to monitor the family. While the child's weight remained a concern, Hildebrand testified that she recommended dismissing the juvenile court proceeding in October 2016 because Chrzan had provided negative drug tests throughout the case and she felt A.M. was "conditionally safe" in Chrzan's care.

In her own testimony, Chrzan blamed A.M.'s death on Dr. Nacos, stating he discontinued A.M.'s high-calorie formula despite Chrzan's objection. She also maintained that information about the appointment and its urgency were not sufficiently communicated to her. While Chrzan agreed that she knew about the October 11 appointment at UIHC, she could not give any concrete reason for missing it.

The jury found Chrzan guilty as charged. On direct appeal, Chrzan raised claims of ineffective assistance of counsel. *See State v. Chrzan*, No. 18-1327, 2019 WL 5067174, at *1 (Iowa Ct. App. Oct. 9, 2019). We rejected one of those claims but preserved her claim that counsel was ineffective for failing to object to prior-bad-acts evidence for postconviction relief. *Id.* at *4. Procedendo issued on December 19, 2019.

Chrzan applied for postconviction relief in January 2020. She claimed criminal trial counsel was ineffective for, among other things, (1) "failing to object to prior bad acts evidence that the State repeatedly referred to on trial day 3,"

(2) "not allowing character witnesses to testify on [her] behalf," and (3) "not attempting to file for a change of venue even though [she] asked him repeatedly." In a pretrial brief filed by court-appointed counsel, Chrzan clarified her claims. On prior bad acts, Chrzan argued "her trial attorney should have objected to evidence that she used street drugs while pregnant with A.M. and that the child was born positive for amphetamines." As to the second claim, Chrzan argued counsel "was deficient in failing to investigate, identify, and call" her grandparents and brother as witnesses "to counter the accusations by the State regarding [her] parenting." And for the change-of-venue claim, Chrzan asserted "Washington County is one of the smaller counties in Iowa and news reports of A.[M].'s death w[ere] widespread."

A postconviction-relief hearing was held in December 2022, following which the district court entered a ruling denying relief. Chrzan appeals, raising the same claims she asserted in district court plus a claim that trial counsel was ineffective for failing to move for a court-appointed expert witness.

## II.    Analysis

Because Chrzan's claims concern the effectiveness of criminal trial counsel, she must prove by a preponderance of the evidence that (1) her counsel failed to perform an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018). We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (citation omitted).

### A. Expert Witness

Chrzan appears to acknowledge that error was not preserved on her expert-witness claim. While she mentioned the issue in her testimony at the postconviction-relief hearing, Chrzan did not raise the claim in her application or pretrial brief, the district court did not rule on it, and she did not file a motion requesting a ruling. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012).

With that deficiency in mind, Chrzan suggests postconviction counsel was ineffective in failing to raise the claim and asks that it be preserved for a successive postconviction-relief action. But because the claim was not raised until this appeal, which was commenced more than three years after procedendo issued on her conviction, the claim is time-barred and cannot relate back to the original filing. *See* Iowa Code § 822.3 (2020) (providing for three-year statute of limitations and explaining "[a]n allegation of ineffective assistance of counsel in a prior case under this chapter shall not toll or extend the limitation periods in this section nor shall such claim relate back to a prior filing to avoid the application of the limitation periods"); *Brooks v. State*, 975 N.W.2d 444, 445–46 (Iowa Ct. App. 2022) (concluding the legislature invalidated the relation-back doctrine established in *Allison v. State*, 914 N.W.2d 866, 891 (Iowa 2018) as to applications filed on or after July 1, 2019); *see also Dible v. State*, 557 N.W.2d 881, 883 (Iowa 1996) ("The issue before us in this case is whether the ineffective assistance of postconviction counsel can constitute a 'ground of fact' within the meaning of the exception to the three-year statute of limitations. We hold it cannot based on the clear language of the statute and our prior case law interpreting it.").

### B. Prior Bad Acts

Turning to Chrzan's main claim—that trial counsel was ineffective for failing "to object to or prevent introduction of prior bad acts evidence"—Chrzan targets the visit notes with Dr. Nacos, which noted a "[p]renatal maternal history of street drugs used during pregnancy"; the autopsy report's reference to the meconium screen positive for amphetamines; and counsel's elicitation of testimony from the department caseworker that A.M. was removed at birth due to a positive test for amphetamines.

Even assuming this evidence was inadmissible as irrelevant and impermissible character evidence, Chrzan must still show breach of duty. We start with a presumption that counsel performed competently, which an applicant must rebut by showing "counsel's representation fell below an objective standard of reasonableness." *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 868 (Iowa 2019) (citation and internal quotation marks omitted). We agree with the district court that Chrzan failed to meet that burden.

Chrzan's trial counsel, Jeffrey Powell, testified at the postconviction-relief hearing that the child's stint in foster care was integral to the State's case. While he "didn't want the jury to know any negative information that they didn't need to have," Powell testified the removal needed to be explained. He "didn't want the jury to think that . . . [the child] had been removed because [Chrzan] had been physically abusive to her baby" or otherwise speculate about the cause for removal because "there's a possibility that their conclusion could be worse than it was." Powell also pointed out that the child was returned to Chrzan's custody. With that in mind, Powell explained: "As it stood, it could have been, okay, the baby was

removed because mom had some drug issues. Mom fixed drug issues. DHS is okay with mom's progress. That's positive. DHS returns child." In the end, Powell determined the mentions of A.M.'s positive drug test at birth were a "necessary evil." And he recalled that evidence about Chrzan's prenatal drug use was not pervasive, and the State was not pressing that topic.

While Powell's chosen course had risks, ineffective assistance "generally does not lie for the exercise of judgment." *State v. Polly*, 657 N.W.2d 462, 468 (Iowa 2003). And "'[i]mprovident trial strategy or miscalculated tactics' typically do not constitute ineffective assistance of counsel." *Id.* (citation omitted). So long as the tactical decision was reasonable, it will not be second-guessed. *Lamasters*, 821 N.W.2d at 866. In our view, Powell's decision to allow the jury to know A.M. was removed because Chrzan used amphetamines while pregnant rather than allowing the jury to speculate was not unreasonable and did not amount to a breach for ineffective-assistance purposes. We accordingly affirm the district court's rejection of this claim.

### C.    Other Witnesses

Chrzan next argues trial counsel was ineffective in failing to investigate and identify her grandparents and brother as witnesses and call them to testify at trial. According to Chrzan, their testimony would have supported a defense that her "parenting was not willfully or intentionally neglectful prior to [the child's] death."

The grandmother and brother did not testify at the postconviction-relief hearing, so Chrzan has not shown their testimony would have been beneficial and, by extension, that the lack of their testimony resulted in prejudice. *See Nichol v. State*, 309 N.W.2d 468, 470 (Iowa 1981) ("Ordinarily complaints about failure to

call witnesses should be accompanied by a showing their testimony would have been beneficial.").

Chrzan's grandfather did testify at the postconviction-relief hearing. But he explained that his contact with Chrzan was limited because he did not live close by. The grandfather only saw Chrzan two or three times a year, although he testified that he did see the child about six weeks before her death and was not concerned about her condition. Otherwise, the grandfather provided no testimony in support of Chrzan's claim that she wasn't a neglectful parent before the child's death. Because Chrzan has not showed the grandfather's testimony would have been beneficial at trial, she has failed to meet her burden to show prejudice. *See id.* We accordingly affirm the district court's rejection of this claim.

### D.     Venue

Finally, Chrzan argues counsel was ineffective in failing to move for a change of venue given pretrial publicity on the case. A defendant can obtain relief on a direct claim of error on a motion for change of venue by showing either "(1) publicity attending the trial that [was] so pervasive and inflammatory that prejudice must be presumed, or (2) actual prejudice on the part of the jury." *State v. Siemer*, 454 N.W.2d 857, 860 (Iowa 1990). But from an ineffective-assistance standpoint, the applicable marker is actual prejudice. *See Borushaski v. State*, No. 01-1683, 2003 WL 183284, at *2 (Iowa Ct. App. Jan. 29, 2003) (rejecting ineffective-assistance claim where voir dire transcript did not show actual prejudice). Even if a showing of presumed prejudice could equate to a finding of *Strickland* prejudice, we conclude Chrzan has shown neither presumed nor actual prejudice.

The transcript from jury selection shows that publicity attending the case was not "pervasive and inflammatory" for purposes of presumed prejudice, and the jury actually seated was impartial. *See Siemer*, 454 N.W.2d at 860–61 (noting relief on presumed prejudice requires proof "that the publicity attending the case was 'pervasive and inflammatory'" and limiting actual-prejudice inquiry to "the jurors actually seated" (citation omitted)). Although twenty-one of the thirty-seven prospective jurors had heard something about the case, each was subjected to individual voir dire. Six ended up serving on the jury, but they all confirmed they could be fair and impartial, unlike seven who were excused for cause because of their knowledge about the case or preconceived opinions.[3]

Because this record does not show presumed or actual prejudice, counsel's pursuit of a change in venue would have been meritless and was not a breach of duty, nor would it have given rise to a reasonable probability of a different outcome. *See State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015) ("[W]here a claimant alleges counsel's failure to pursue a particular course breached an essential duty, there is no such duty when the suggested course would have been meritless."). As a result, we agree with the district court's denial of this claim.

**AFFIRMED.**

---

[3] Two others were excused for cause for other reasons—one for a medical issue and another who had issues with the county attorney's office. The remaining jurors who were not selected but had been exposed to some pretrial publicity generally knew very little about the case and otherwise said they could be fair. Peremptory strikes were used on each of these jurors.